UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KATIE WAGONER,

               Plaintiff,

      v.                                     CAUSE NO. 3:18-CV-520 DRL-MGG

NPAS, INC.,

               Defendant.

<u>OPINION & ORDER</u>

After Saint Joseph Regional Medical Center treated Katie Wagoner three times and her child once, the hospital adjusted her debts for any applicable insurance and sent the account balances to an early-out healthcare billing company, NPAS, Inc., to service payment. NPAS sent her several billing statements. She now sues under the Fair Debt Collection Practices Act—a federal statute that authorizes private suits for unlawful collection practices—but this law applies only to debt collectors. The accounts here weren't in default when NPAS obtained them, so the company wasn't acting as a debt collector. Accordingly, the court grants summary judgment for NPAS.

BACKGROUND

Katie Wagoner received medical treatment at SJRMC in Mishawaka, Indiana on April 18, 2017 (Account 1), June 14, 2017 (Accounts 2 and 3), and December 5, 2017 (Account 4). ECF 37-1, 41-3. Ms. Wagoner was treated on all three dates and her minor child was treated once on June 14, resulting in a total of four accounts guaranteed by Ms. Wagoner.

Upon each hospital admission, Ms. Wagoner signed a patient contract with SJRMC, which states: "I agree to pay my account in full upon discharge from the Medical Center unless other arrangements are made in advance." ECF 37-1. On each occasion, Ms. Wagoner was discharged from SJRMC on the same day as admission. ECF 37-2 at 18, 32, 48, 61. Ms. Wagoner's accounts were then

submitted to her insurance company for payment. *Id.* After any applicable insurance payments or adjustments, the accounts were left with unpaid balances ranging from $5.80 to $536.28. *Id.*

SJRMC sent the accounts to NPAS for billing and servicing within 30-64 days after the dates of service and discharge. *Id.* at 21, 34, 49, 62.[1] NPAS sent Ms. Wagoner two statements per account. *Id.* at 25-29, 33-34, 38-42, 53-57, 67-71. All statements said NPAS "is a company that is managing your account for the healthcare provider." *Id.* The statements also indicated where the services were provided (SJRMC). *Id.* The second statement for each account cautioned Ms. Wagoner that "if payment in full is not received, your account may be referred to a debt collector without further notice." *Id.* at 28, 41, 56, 70. None of the accounts were charged interest before or during the time they were placed with NPAS. *Id.* at 21, 25-29, 38-42, 48-49, 53-57, 61-62, 67-71.

NPAS is as an "early-out" service for healthcare systems and independent hospitals. *Id.* at 2. NPAS bills and attempts to resolve balances on unpaid accounts before the account is deemed delinquent. *Id.* According to the Master Service Agreement (MSA) between NPAS and Trinity Health Corporation (SJRMC's corporate parent), NPAS functions as "an extension of [ ] Trinity's business office[.]" ECF 39 ¶ 9.8. In particular, the MSA provides:

> Trinity understands and agrees that [NPAS] is in the business of servicing accounts that are not in default when [NPAS] takes responsibility for the accounts, and that [NPAS] cannot render services to Trinity on Defaulted Accounts. "Defaulted Accounts" means accounts that are considered to be "in default" according to any agreement between the Affiliate [SJRMC] and the patient or payor, and applicable law, as implemented by the Affiliate's policies, procedures or guidelines. . . . Affiliate will not place with, transmit to, assign, or otherwise provide to [NPAS] for servicing any Defaulted Accounts . . . .

*Id.* Typically, an early-out billing company will assist with servicing a debt for a certain period of time, and then turn the account back to the hospital to determine whether to default the account and

---

[1] Account 1 was placed 60 days after service; Account 2 was placed 42 days after service; Account 3 was placed 64 days after service; and Account 4 was placed 30 days after service. ECF 37-2 at 21, 34, 49, 62.

procure the services of a debt collector. This arrangement was no different. *See id.* ¶¶ 4.1, 5.1, 9.3 (amended), 9.8, 11.15.

Ms. Wagoner filed this lawsuit against NPAS seeking damages for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (FDCPA), and the Indiana Deceptive Consumer Sales Act, Ind. Code 24-5-0.5-1 *et seq.* (IDCSA). Ms. Wagoner claims NPAS didn't disclose information required by law. 15 U.S.C. §§ 1692e(11), 1692g(a)(3)-(5). NPAS says it wasn't a debt collector and wasn't then subject to the FDCPA because Ms. Wagoner's accounts weren't in default at the time the company acquired them. Ms. Wagoner says the debts were in default at that time, thereby making NPAS a debt collector. The parties filed crossmotions for summary judgment on this sole issue.

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must deny a summary judgment motion when there is admissible evidence that creates a genuine issue of material fact—a triable issue. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The factual record here isn't materially in dispute.

3

DISCUSSION

A.      *NPAS Wasn't a Debt Collector for these Debts under the Fair Debt Collection Practices Act.*

"Disruptive dinnertime calls, downright deceit, and more besides drew [an] eye to the debt

collection industry. From that scrutiny emerged the Fair Debt Collection Practices Act, a statute that

authorizes private lawsuits and weighty fines to deter wayward collection practices." *Henson v. Santander*

*Consumer USA Inc.*, 137 S. Ct. 1718, 1720 (2017). Congress designed the FDCPA "to eliminate abusive

debt collection practices by debt collectors, to insure that those debt collectors who refrain from using

abusive debt collection practices are not competitively disadvantaged, and to promote consistent State

action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

To establish an FDCPA violation, Ms. Wagoner must show that (1) NPAS qualified as a "debt

collector" under 15 U.S.C. § 1692a(6), (2) NPAS violated one or more substantive provisions of the

statute, and (3) NPAS took its violative actions in connection with collecting a debt. *See Gburek v.*

*Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010). Ms. Wagoner says NPAS violated 15 U.S.C.

§§ 1692e(11) and 1692g(a)(3)-(5) by not making various disclosures (*e.g.*, NPAS didn't say it was a debt

collector). NPAS argues that it was not a debt collector subject to this federal law.

The court starts with the statutory text. The statute distinguishes between creditors and third-

party debt collectors. *See Aubert v. Am. Gen. Fin., Inc.*, 137 F.3d 976, 978 (7th Cir. 1998). A creditor

who collects in its own name and whose principal business is not debt collection is not subject to the

act (*e.g.*, the hospital here). *Id.* In contrast, a debt collector is a person collecting a "debt owed or due

or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Congress intended to distinguish

between "[c]reditors, who generally are restrained by the desire to protect their good will when

collecting past due accounts," and "debt collectors, who may have no future contact with the

consumer and often are unconcerned with the consumer's opinion of them." *Schlosser v. Fairbanks Cap.*

4

*Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) (quoting S. Rep. No. 95-382 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696) (quotations omitted).

The statute gives and takes away. From the general definition of debt collector, the statute exempts certain actors. *See* 15 U.S.C. §§ 1692a(6)(A-F). The pertinent provision here excludes:

> any person collecting any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person[.]

15 U.S.C. § 1692a(6)(F)(iii). It follows that where the original creditor assigns or otherwise places the debt with another for collection, the law treats the recipient as a "debt collector[] if the debt sought to be collected was in default when acquired by the assignee, and as [a] creditor[] if it was not." *Schlosser*, 323 F.3d 536. The designations of creditor and debt collector thus often remain mutually exclusive. *Id.*; *cf. Henson*, 137 S. Ct. at 1724 (assuming without granting this premise).

NPAS serves as an "early-out" collector and extended business office for healthcare systems. A company hired to service the debt of another—*i.e.*, send bills and collect routine payments—falls under the "creditor" category so long as the debt wasn't in default at the time it obtained the account. *See Schlosser*, 323 F.3d at 536; *Magee v. AllianceOne, Ltd.*, 487 F. Supp.2d 1024, 1028 (S.D. Ind. 2007) (Lawrence, J.). If a company continues to service it as a current account, "it is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector." *Schlosser*, 323 F.3d at 536; *accord* S. Rep. No. 95-382 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1698 (FDCPA not meant to cover "companies [ ] who service outstanding debts for others, so long as the debts were not in default when taken for servicing").

The critical inquiry today is thus the debt's status at the time it was obtained—whether in default or not. *See Schlosser*, 323 F.3d at 536. "[T]he word 'obtained' can (and often does) refer to taking possession of a piece of property without also taking ownership . . . . And it's easy enough to see how you might also come to possess (obtain) a debt without taking ownership of it. You might, for

example, take possession of a debt for servicing and collection even while the debt formally remains owed another." *Henson*, 137 S. Ct. at 1723. NPAS did just that. The MSA enables NPAS to service the hospital's accounts, albeit while the hospital retains certain controls and ownership over the accounts—in particular, requiring all payments to be made to SJRMC, not NPAS.

The statutory definition of debt collector and the exception speak in terms of a debt's status. 15 U.S.C. § 1692a(6) ("debts owed or due or asserted to be owed or due another"); 15 U.S.C. § 1692a(6)(F) ("any debt owed or due or asserted to be owed or due another"). By its language, the FDCPA thus calls on the court to consider the debt's actual status, *see Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387-88 (7th Cir. 1998), and its asserted status, even if the collector has made a mistake in its assertion about the debt, *see Schlosser*, 323 F.3d at 538. Looking to the debt's status reveals whether the activity directed at the consumer is servicing or collection. *Id.* If the debt is current when it is acquired, "the relationship between the assignee and the debtor is, for purposes of regulating communications and collection practices, effectively the same as that between the originator and the debtor." *Id.* On the other hand, "[i]f the loan is in default, no ongoing relationship is likely and the only activity will be collection." *Id.*

Effectively the court is presented with a one-sided flashcard—the word "default" printed on the front and a blank slate on the back. The court must decide whether the debt was in default under the FDCPA though Congress didn't define the term "default." In the intervening years since the statute was enacted, courts across the country have interpreted the meaning of "default," with less than uniformity. *See, e.g.*, *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362-63 (6th Cir. 2012) (holding that default under the FDCPA includes a debt that the collector treated as if it were in default at the time of acquisition); *Mavris v. RSI Enters.*, 86 F. Supp.3d 1079, 1086 (D. Ariz. 2015) (considering what a reasonable debtor would believe, given the totality of the circumstances, where contract did not

define default); *Magee*, 487 F. Supp.2d at 1028 (applying the plain meaning of default where contract did not define it).

This circuit has reviewed the concept of default in other contexts. *See, e.g., Schlosser*, 323 F.3d at 538 (finding the account in default for purposes of the FDCPA when collection agency mistakenly believed it to be in default); *Bailey*, 154 F.3d at 388 (finding a forbearance note wasn't in default though the original note was according to its terms); *see also McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 501-02 (7th Cir. 2008) (finding the account in default for purposes of FDCPA after being in a period of delinquency for two years), *overruled on other grounds*, *Henson*, 137 S. Ct. at 1721-24 (overruling finding of debt collector when there was no collection "for another" per statute). Although these cases serve as sturdy guideposts, they don't reach the definition of "default" that the court must here discern.

So the court returns to the text. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Id.* "Default" means the "[f]ailure to meet financial commitments; non-payment of money owed; the state of being unable to fulfil financial obligations," *Default*, *Oxford English Dictionary Online* (Mar. 2020), or the "omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due," *Default*, *Black's Law Dictionary* (11th ed. 2019). *See also In Default*, *Oxford English Dictionary Online* (Mar. 2020) ("a state of being unpaid").

The word "default" cannot be divorced from the statute's remaining text. A word is known by the company it keeps. *United States v. Williams*, 553 U.S. 285, 294 (2008) ("meanings are narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated"). Particularly, 15 U.S.C. § 1692a(6)(F), the exception at issue here, presupposes a distinction among several concepts of debt:

- A "debt"—that is, the consumer's obligation. *See* 15 U.S.C. § 1692a(5) (defining "debt" as an "obligation or alleged obligation"); *Heintz v. Jenkins*, 514 U.S. 291, 293 (1995) (limited to consumer debt); *Schlosser*, 323 F.3d at 538 (actual or asserted

debt). For instance, a sum of money that is payable is a debt regardless of whether it is payable now or in the future. The debt is merely the obligation.

- A "debt owed"—that is, the obligation currently owed or asserted to be owed, though perhaps not due to be paid today. *See, e.g., Henson*, 137 S. Ct. at 1722-23 ("it quickly becomes clear that Congress routinely used the word 'owed' to refer to present (not past) debt relationships"). For instance, a promissory note for $1000 on which $200 has been paid has a "debt owed" of $800, and a current one, *see id.*, though that $800 may not be due under the note's terms right now. A debt "owed" may not be a debt "due."

- A "debt due"—that is, the obligation payable on its terms now or as specified. *See, e.g., id.* at 1722 (accepting definition of "due" as a "debt *currently* due at the time of collection"). For example, a promissory note with $800 still owed and $100 due on the first of each month would have a "debt due" on May 1, 2020, then again June 1, 2020, and so on until the "debt owed" has been repaid.

- A debt "in default"—that is, the obligation payable now that carries added repercussions because it has moved into a persistent state of non-payment, often declared by statute or contract. It is the "omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due," *Default, Black's Law Dictionary* (11th ed. 2019).

After all, Congress in passing the FDCPA was focused on eliminating abuses in the active collection of debts by debt collectors, not in the service of accounts by mere creditors. *See* 15 U.S.C. § 1692(e). By its plain language, the FDCPA had more in mind than just a ripe debt when it described a debt "in default." In this statute, a debt in default cannot then mean merely the money owed or the obligation to pay financial commitments alone. The words walking hand-in-hand with "default" in this exception winnow the optional definitions to the failure to pay a debt when due in reference to a legal or contractual duty. A debt will not go into default until after it has become owed and due.

Several courts have stressed that strict use of the dictionary definition of "default" would erase the difference between an account that is merely delinquent and one that is in default. *See Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 86-87 (2d Cir. 2003) (collecting cases); *see also De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1075 n.3 (9th Cir. 2011) ("The Act's legislative history is consistent with construing 'in default' to mean a debt that is at least delinquent, and sometimes more than overdue."). Courts have looked to other federal statutes to show that there is generally a period between the

moment of non-payment and the designation of default, often called a period of delinquency. *See Alibrandi*, 333 F.3d at 87 (collecting cases); *see, e.g.,* 34 C.F.R. § 682.200(b) (270-330 days after non-payment); 7 C.F.R. § 762.141(a) (30 days for farm loans); 12 C.F.R. § 336.3(c) (90 days for loans by federal insured depository institutions to Federal Deposit Insurance Corporation employees); 34 C.F.R. § 685.102(b) (270 days for certain student loans). For instance, in cases involving student loan collections under the FDCPA, federal courts have looked to the definition of default within the Federal Family Education Loan Program, which indicates that debts go into default after so many days of delinquency. *See Alibrandi*, 333 F.3d at 87; *see, e.g., Skerry v. Mass. Higher Educ. Assistance Corp.*, 73 F. Supp.2d 47, 51 (D. Mass. 1999).

That said, at least one court has not been convinced that there is an understood interim period between non-payment and default. *See, e.g., Magee*, 487 F. Supp.2d at 1028. *Magee* found that when a creditor has not explicitly defined default in its contract, allowing it unilaterally to announce the moment of default would contravene the FDCPA's purpose. *Id.* Creditors could then decide whether "the provisions of the FDCPA applied to the debt collection activities of the collection agency it hires." *Id.* A creditor would be able to refer the debt to a servicing agency "one day and declare[] [the] account to be in default the next, thereby allowing the [agency] to engage in collection practices that are prohibited by the FDCPA" because the debt was not "in default" when the agency "obtained" it. *Id.* In lieu, the district court held that "default" carries its dictionary meaning—the "omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." *Id.* at 1027 (quoting *Black's Law Dictionary* (7th ed. 1999)).

This court reaches an aligned conclusion definitionally and applies the plain meaning of "default." The court's rationale diverges thereafter largely because the facts do. *Magee* remained ever concerned that an agreement that left the declaration of default within the creditor's sole discretion would contravene the FDCPA's purposes. *Id.* at 1028. The court today has no cause to disagree

because the contract here, though not explicitly defining "default," nonetheless demonstrates that the relevant financial obligations weren't in default. *Magee* seemed not to have that luxury of terms.

One court recently used a different analysis for early-out services. In *Young v. NPAS, Inc.*, 361 F. Supp.3d 1171, 1194-96 (D. Utah 2019), the district court held NPAS to be a debt collector under the FDCPA, but did so with the "guiding principle" that debts were "in default" when "a reasonable person in the debtor's position [would] believe that the creditor viewed the debt as being in default." That debtor-centric focus, borrowed from the judge-made multifactor test in *Mavris*, 86 F. Supp.3d at 1086, isn't the standard in this circuit. *See Bailey*, 154 F.3d at 388; *Schlosser*, 323 F.3d at 538. With respect, that view seems divorced from the statute's language—which focuses on the status of the debt when obtained by the so-called collector, not the debtor's perspective without regard to that statutory question. 15 U.S.C. § 1692a(6)(F)(iii); *accord Schlosser*, 323 F.3d at 536; *Bailey*, 154 F.3d at 387-88; *see also Henson*, 137 S. Ct. at 1723. To the extent Ms. Wagoner advocates for the *Young/Mavris* approach alone, the court declines based on the statute's plain meaning and the contract here.[2]

Other observations underscore the wisdom to divert from a debtor-centric test here. For a few years after 1997, the Federal Trade Commission recommended an amendment to Congress concerning early-out businesses (like NPAS). *See, e.g.*, Fed. Trade Comm'n, *Annual Report* (June 2000), at www.ftc.gov/reports/annual-report-congress-fair-debt-collection-practices-act. Seemingly worried that these businesses function like debt collectors but often are exempt from coverage, the FTC urged Congress to amend section 803(6)(F)(iii) (the same exemption here) to focus on the nature of the overall business conducted by the party rather than the status of the obligations (debts) when the

---

[2] Even so, *Mavris* first considered "any underlying contracts and applicable law governing the debt at issue," citing a Federal Trade Commission advisory opinion from 1989 that "[w]hether a debt is in default is generally controlled by the terms of the contract creating the indebtedness and applicable state law." *Mavris*, 86 F. Supp.3d at 1084. *Young* likewise first considered the creditor agreements but found no objective definition of default and refused to permit the creditor to say unilaterally when the debts had gone into default, before turning to its debtor-centric test. *Young*, 361 F. Supp.3d at 1194.

third-party collector obtained them. The FTC has not recommended this amendment since, and certainly Congress has not amended the FDCPA to adopt this view.[3] The court won't judicially institute what Congress hasn't enacted.

The court sees little reason, given the statute's plain meaning, to be so wary of contract terms when there isn't evidence that practices were instituted to evade the FDCPA. After all, to determine whether a person has failed to pay a debt when due, one must look to the contract (or relevant statute) to make that determination. Courts examine statutes and contracts to determine when debts are owed, and when debts are due; it makes little sense not to consult and enforce contracts to determine when debts are in default. The definition of "default" contemplates this very thing. *See Default*, *Black's Law Dictionary* (11th ed. 2019) ("omission or failure to perform a *legal or contractual duty*; esp., the failure to pay a debt when due") (emphasis added).

In addition, superimposing "default" on a debt without reference to the contract would not just ignore the realities of the creditor-debtor relationship but have the "paradoxical effect of immediately exposing debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus, from which the [FDCPA] intended to afford debtors a measure of protection." *Alibrandi*, 333 F.3d at 87. The FDCPA's remedial purposes would not be served by declaring every debt in "default" the moment a payment becomes due without reference to the contract, much less when a debtor might believe that has happened. So enigmatically would this occur when, for instance, a contract declared a "debt due" on a particular date yet nonetheless afforded a grace period before a debt became "in default;" or when a contract declared a "debt owed" on a certain date but deferred payment until insurance had been applied.

---

[3] The most recent amendments to the FDCPA were in 2006 (P.L. 109-351) and 2010 (P.L. 111-203, the Dodd-Frank Act). After the Dodd-Frank Act, the Consumer Financial Protection Bureau became jointly responsible for FDCPA enforcement along with the FTC and solely responsible for annual reports to Congress. It seems the CFPB has not made a similar "early-out" recommendation to Congress.

Courts needn't look so askance at reasonable contract terms. Congress can legislate additional protections if, as a policy matter, it doesn't like what it has written. Parties have the freedom to contract so long as not contrary to public policy. *Steele v. Drummond*, 275 U.S. 199, 205 (1927) ("freedom of contract is not to be lightly interfered with" except in clear cases where enforcement would contravene public policy); *Raymundo v. Hammond Clinic Asso.*, 449 N.E.2d 276, 279 (Ind. 1983) (quoting *Hodnick v. Fidelity Trust Co.*, 183 N.E. 488, 491 (Ind. Ct. App. 1932)) ("courts will keep in mind the principle that it is to the best interest of the public that persons should not be unnecessarily restricted in their freedom of contract . . . unless [the contract terms] are clearly contrary to what the constitution, the legislature, or the judiciary have declared to be the public policy or unless they clearly tend to the injury of the public in some way"); *Johnson v. USA Underwriters*, 936 N.W.2d 834, 842 (Mich. Ct. App. 2019) (quoting *Corwin v DaimlerChrysler Ins. Co.*, 819 N.W.2d 68, 76 (Mich. Ct. App. 2012)) ("It is a bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent . . . a contract in violation of law or public policy.") (internal quotations omitted).[4] There is no evidence here that contractual terms or payment guidelines were adopted against the public policy established by the FDCPA.

This circuit too has considered the contractual meaning of default in assessing the difference in debt status between an individual who had defaulted on an original note and then had that status superseded by a renegotiated payment plan. *Bailey*, 154 F.3d at 387. Hence a person pursuing a defaulted debt may well be a debt collector, whereas a person pursuing payments due under a current repayment plan would merely be servicing the plan (akin to a credit card company sending statements to customers of amounts owed). *See id.* In reaching this conclusion, this circuit explained that, if it chose not to make this "common-sense distinction between defaulted agreements and superseding

---

[4] The contract between SJRMC and Ms. Wagoner was made in Indiana, whereas the contract between SJRMC and NPAS is governed by Michigan law.

agreements not in default, we would be ignoring the terms and the parties' undoubted purpose behind the new payment plans[.]" *Id.*; *accord De Dios*, 641 F.3d at 1074 ("Although the Act does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue."); *Alibrandi*, 333 F.3d at 87 n.5 ("Once the parties have contractually set the period of delinquency preceding default, it will be a relatively simple matter to determine whether the Act applies"). In short, contract terms matter in defining default. Ignoring them helps neither creditor nor debtor.

In addition to statutory and contractual guidance consistent with the FDCPA's plain meaning, the court may consider other relevant circumstances to determine whether a debt is deemed in default. The FDCPA sources one of those circumstances. In looking to statutes or contracts, of course the court is assessing the actual status of the debt; but recall that, regardless of when a debt may actually go into default, a collector might mistakenly assert the debt as one in default and thus be captured by the FDCPA's protections. *See Schlosser*, 323 F.3d at 538 (finding an account in default when the collection agency mistakenly believed it to be in default); *see also* 15 U.S.C. § 1692a(6) ("debt owed or due or asserted to be owed or due"); 15 U.S.C. § 1692a(6)(F) ("any debt owed or due or asserted to be owed or due"). Therein lies one relevant circumstance—an asserted default—within the statute's plain language.

Other reasonable contract-related documentation may also guide a determination of when a debt or account is "in default." *See, e.g., Bailey*, 154 F.3d at 387-88 (examining letter demanding payment from the debtor); *Bohringer v. Bayview Loan Servicing, LLC*, 141 F. Supp.3d 1229, 1238-1239 (S.D. Fla. 2015) (creditor's agreement, written guidelines, and communications may be considered to determine whether debt is "in default" for FDCPA purposes); *Prince v. NCO Fin. Servs.*, 346 F. Supp.2d 744, 747 (E.D. Pa. 2004) ("in the absence of a contractual definition or conclusive state or federal law, a creditor's reasonable, written guidelines may be used to determine when an account is 'in default'").

After all, course of dealing, course of performance, or ordinary practices in the trade may give rise to a contract, *see*, *e.g.*, *Johnson v. Scandia Assocs.*, 717 N.E.2d 24, 30-31 (Ind. 1999), or interpretative capabilities vis-à-vis the contract, *see*, *e.g.*, *Luedtke Eng'g Co. v. Ind. Limestone Co.*, 740 F.2d 598, 599-601 (7th Cir. 1984).

In the end, the court sees no reason to go beyond the FDCPA's plain text to appreciate that a debt in default has meaning other than (and really subsequent to) a debt owed or due, or to define "default" other than through its plain meaning. "If judges won't defer to clear statutory language, legislators will have difficulty imparting a stable meaning to the statutes they enact." *Schlosser*, 323 F.3d at 538 (quoting *Krzalic v. Republic Title Co.*, 314 F.3d 875, 879-80 (7th Cir. 2002)). Besides which, the court's job is to enforce the constitutionally valid law Congress has written, not rewrite it—"to apply, not amend, the work of the People's representatives." *Henson*, 137 S. Ct. at 1726. The statutory exception within 15 U.S.C. § 1692a(6)(F) plainly distinguishes a debt owed or due and a debt in default. In this case, the court needn't consult legislative history or other federal statutes to draw that distinction when Congress has done that already in the words it chose.

Likewise, the law needn't be massaged to read in a mechanically set period of delinquency before a debt goes into default. The fact that many contracts and statutes choose to provide such a delinquency period does not necessitate its inclusion in every case, *see, e.g., Hartman v. Meridian Fin. Servs.*, 191 F. Supp.2d 1031, 1043-44 (W.D. Wis. 2002), particularly when Congress has not expressly written one into the FDCPA. It could be that a contract defines a time of delinquency—when an initial non-payment has occurred, but the debtor still has the opportunity to resume payments or pay before a date where the debt will then be declared in default. *See, e.g., Alibrandi*, 333 F.3d at 87 n.5. A contract may incorporate a grace period. In contrast, an agreement could also allow for a creditor to declare an account in default the moment non-payment occurs. *See Prince*, 346 F. Supp.2d at 748 (agreement allowed creditor to declare the debt in default in the event debtor "fail[ed] to pay minimum

payment on time"); *Hartman*, 191 F. Supp.2d at 1043-44 (agreement stated that debt was in default at the moment the debtor missed a payment). That declaration of default may well occur—either actually or because a collector asserts as much, albeit mistakenly. It ultimately is a case-by-case analysis. *See, e.g., Prince*, 346 F. Supp.2d at 747.

Consistent with its broad remedial purpose, the FDCPA builds in flexibility on when a specific debt will prove in default for the host of circumstances it was meant to redress. By its plain language, a debt will go beyond one owed or due and go into default when a statute, contract, or other relevant circumstance bearing on the debt's legal or asserted status says it does. Default means the failure to perform a legal or contractual duty, particularly the failure to pay a debt when due. Congress blazed a clear trail—the court need only follow the torchbearing language faithfully. Here endeth the lesson.

The court begins then by analyzing the actual status of this debt (holding until later a discussion of its asserted status). The parties cite no corollary statute or regulation that defines default for this type of debt. SJRMC and the patient had a contract for services. Unhelpfully, the patient contract (entitled "Patient Consent, Financial Agreement, Authorization and Assignments") (ECF 37-1) doesn't define default. It clarifies nonetheless that default comes after a delinquency period and after other arrangements have been exhausted. The contract states that Ms. Wagoner "agree[s] to pay [her] account in full upon discharge from the Medical Center unless other arrangements are made in advance." Ms. Wagoner views this as the operative provision; she is right only insofar as this provision describes when, under the FDCPA, her obligation became a "debt owed"—the date of her discharge—pending other arrangements. In addition, the forms state that Ms. Wagoner "agree[s] to pay interest at the legal rate, in the event of delinquency, unless other arrangements are made in advance." Once again, the contract contemplates the exhaustion of other arrangements and delinquency before the contract ripens to default.

15

NPAS argues that "other arrangements" were made in the form of submitting her accounts to insurance. That is common in the healthcare industry, and no one disputes it. Indeed, the patient contract says the "Medical Center submits claims to insurance" (albeit phrased as a courtesy), and the contract assigns a patient's rights to "all insurance benefits" to "secure payment of [her] past, present and future indebtedness" to the hospital. SJRMC submits claims to insurance, subtracts any benefits from the amount due, and then approves billing to patients for the remainder. Nothing suggests that an account at SJRMC under this contract has moved into default until after insurance has been applied. It remains under the contract's language a "debt owed" certainly, but not a debt "in default."[5]

This is precisely what occurred on Accounts 1-3. The account notes reflect that insurance was sought and applied. Indeed, at the time Ms. Wagoner was discharged from SJRMC, she had received no bills or statement that would even inform her of her liability. *See, e.g.,* ECF 37-2 at 18-19 (account notes stating "$0 patient liability" at the date of discharge). While contractually there may have been a debt owed at this time, it certainly had not yet materialized into a debt due, much less one in default. Ms. Wagoner had no idea at the time of discharge what amount she was responsible to pay (what was "owed" or "due"), and not until other arrangements had been exhausted through insurance. SJRMC didn't expect Ms. Wagoner to pay at the time of discharge because the hospital had not even presented her with a bill.[6] SJRMC charged no interest on her accounts between the dates of discharge and their placement with NPAS. SJRMC thus had not considered Ms. Wagoner to have missed any payments

---

[5] While the court sets aside for this analysis the MSA's intent for SJRMC to place with NPAS only accounts not "in default" (ECF 39 § 9.8), the MSA contemplated that NPAS would return any accounts to SJRMC when the patient had pending insurance coverage (*Id.* § 11.15)—thus consistent with the idea that insurance coverage would precede the determination of a final balance and billing due date.

[6] There is nothing in the record that indicates SJRMC requested payment from Ms. Wagoner even before placing the accounts with NPAS. At one point in her deposition, she confesses that she never received any billing communication directly from SJRMC (ECF 41-1 at 41).

to qualify her account as delinquent, much less in default. *Cf. McKinney*, 548 F.3d at 501-02, *overruled on other grounds*, *Henson*, 137 S. Ct. at 1721-24.

Consistent with the contracts, the statements sent to Ms. Wagoner told her when payments were "due" ("Payment Due By")—often about 14-15 days from the statements from NPAS—and then a second billing statement extended that due date—usually another 14-25 days from the original due date (ECF 41-4). If payments had not become due, they can hardly have fallen into default beforehand under the statute. The statements indicated that insurance was billed. The statements made no mention of any debt, or a debt in default, but spoke in terms of her outstanding "balance." The second statement mentioned that, if the payment was not received in full, the account "may be referred to a debt collector." NPAS was contractually required to give patients thirty days after the payment deadline in its final written notice before returning the accounts to SJRMC for referral to a debt collector (MSA ¶ 9.3 (amended)). The statements quite plainly told Ms. Wagoner that NPAS was a "company that is managing [her] account for the healthcare provider." There was no mystery here what service NPAS was providing. These statements underscore that the debts were "due" in the future—not then in default, much less in default when NPAS originally obtained them.

"Of course a debtor may be in default of some debts and not others," *Bailey*, 154 F.3d at 387, but the same analysis holds for Account 4. Ms. Wagoner ultimately didn't have insurance coverage for this account. The hospital attempted to confirm insurance coverage, but that came back unconfirmed at which point the hospital sent the account to NPAS for billing. In the first statement for this account, NPAS used language different from its other statements. Instead of referring to Ms. Wagoner's insurance, NPAS's letter states: "This account balance is your responsibility. Please send payment in full today." ECF 41-4 at 10. The record is devoid of any prior communication that explained the amount owed and now due from Ms. Wagoner. Her account was again not charged any interest before its placement with NPAS (nor assessed legal fees). The statements merely advised her of the future

due date for her payment on the account. *See Bailey*, 154 F.3d at 388-89 ("The important letter . . . does not 'demand' any payment whatsoever, but merely informs the Baileys about 'the current status' of their account. *The due dates listed in the letter are all prospective.* Surely this is not the type of dunning letter that describes a communication related to 'the collection' of a debt.") (emphasis added). Accordingly, these debts were not actually in default when NPAS obtained them.

The court turns next to the asserted status of the debts. This circuit has held that even when the debt is not actually in default, it may still be considered so for purposes of the FDCPA when a collector treats it as such, even if mistakenly. *Schlosser*, 323 F.3d at 538-39; *see also Bridge*, 681 F.3d at 362-63 (collector could not escape coverage by asserting that the debt was not actually in default, having dunned plaintiffs for months); *Alibrandi*, 333 F.3d at 88 (irrelevant that the defendant was labeled as a "service provider" in its agreement with the creditor when a prior company servicing the account held itself out as a debt collector when contacting the debtor). In *Schlosser*, 323 F.3d at 539, this circuit found an assignee to be a debt collector because it attempted to collect on a debt that it asserted was in default and because that asserted default existed when it acquired the debt.

Again, the communications from NPAS were consistent with its role as an extension of SJRMC's business office, not as a debt collector. The MSA requires all patient communications from NPAS to be pre-approved by SJRMC—demonstrating NPAS merely serves as an extension of the hospital in facilitating collection. Its communications relate back and underscore that the debt was not in default at the time NPAS obtained it. The statements indicated that insurance was billed where applicable, mentioned no "debt" and only a "balance," and described NPAS as a company managing her account for the hospital. *See Bailey*, 154 F.3d at 385-86 (not a debt collector though using "delinquency" in communications to the consumer); *see also Evans v. NPAS, Inc.*, No. 8:18-cv-02139, 2020 U.S. Dist. LEXIS 35976, 12-14 (D. Md. Mar. 2, 2020) (though contract offered no definition of default, NPAS wasn't a debt collector because the patient hadn't been billed when she was discharged,

18

the hospital hadn't treated the debt as in default, and NPAS never told the patient the account was in default). The only assertion about the debts here was that an amount was owed and due, but not in default. NPAS wasn't a debtor collector subject to the FDCPA.

NPAS has been the subject of many other cases. This court's ruling stands in line with the spoken majority. For instance, most recently in *Raya v. NPAS, Inc.*, No. 1:19-cv-750, Dkt. 82 at 9-12 (E.D. Va. March 31, 2020) (ECF 48-1 here), Judge Liam O'Grady held that NPAS was not a "debt collector" in providing early-out services to a hospital, and likewise did so under plain contractual language, though under clearer language than what the court has at its fingertips today. Judge Paula Xinis and Judge James S. Moody, Jr. likewise held that NPAS was not a debt collector based on similar circumstances—all the while finding, for valid reasons, *Young's* contrary holding unpersuasive. *See Evans*, 2020 U.S. Dist. LEXIS 35976 at 12-14; *Collazo v. NPAS, Inc.*, No. 8:18-cv-2508, Dkt. 59 at 8-13 (M.D. Fla. June 14, 2019) (ECF 37-3 here).

Other than *Young*, Ms. Wagoner cites *Fausz v. NPAS, Inc.*, 237 F. Supp.3d 559 (W.D. Ky. 2017), where the court found NPAS to be a debt collector; however, it did so because the hospital there had sent the patient's account to United Collections Bureau, Inc., a debt collection agency, a year before the hospital placed the account with NPAS. That collection agency had sent the patient a dunning letter. Accordingly, the hospital had treated the account as in default. *Fausz* is thus manifestly inapplicable here. Ms. Wagoner presents no other federal decisions holding NPAS a debt collector under the FDCPA based on the merits. Decisions based on the pleadings aren't helpful to this discussion. *See, e.g., Fourney v. NPAS, Inc.*, No. 9:18-cv-81612, Dkt. 20 (S.D. Fla. May 6, 2019) (denying motion to dismiss based on complaint and finding that whether NPAS was "properly considered a debt collector for FDCPA purposes shall be held in abeyance until the summary judgment phase, at which time the [c]ourt will have the benefit of all relevant facts adduced in discovery").

Because the accounts here were not in default at the time NPAS obtained them, NPAS was not a debt collector for purposes of the FDCPA. The court must grant summary judgment to NPAS accordingly. Fed. R. Civ. P. 56(a).

> B.    *Because NPAS Wasn't a Debt Collector under the Fair Debt Collection Practices Act, the Company Wasn't Subject to the Indiana Deceptive Consumer Sales Act.*

Ms. Wagoner also pursues a claim under the Indiana Deceptive Consumer Sales Act. To sustain this claim, she must prove a "supplier" committed an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a); *see also Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 618 (Ind. Ct. App. 2019). The IDCSA includes a "debt collector" as such a supplier and defines "debt collector" coterminously with the FDCPA. Ind. Code §§ 24-5-0.5-2(a)(3)(B), (a)(13); *see also* 15 U.S.C. § 1692a(6). Having not established NPAS a debt collector under the FDCPA, she likewise cannot do so under the IDCSA. It would seem then that the court must enter summary judgment for NPAS on all claims, save to pause on one important jurisdictional issue.

The court has supplemental jurisdiction over the IDCSA claim under 28 U.S.C. § 1367(a). Normally, when "all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolv[e] them on the merits." *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)); *see also* 28 U.S.C. § 1367(c)(3) (court may decline supplemental jurisdiction over state law claim when court has dismissed all claims within its original jurisdiction). That said, the court may rule on the state claim when it is absolutely clear how the pendent claim should be decided, or when substantial judicial resources have been committed to the case that would be materially duplicated by sending the claim to state court. *Sharp Elecs. Corp.*, 578 F.3d at 514-15.

The court elects to retain jurisdiction over Ms. Wagoner's state law claim and decide it on the merits for two reasons. First, the court has expended substantial judicial resources on this case. It is

an aged case, with a year devoted to discovery, now ripened into a full summary judgment motion. The parties clarified at the last status conference that the sole issue is whether NPAS acted as a debt collector under the FDCPA (and thus the IDCSA). Second, because the statutes coterminously define "debt collector," it is clear how the state claim should be decided. Accordingly, the court enters summary judgment against Ms. Wagoner on this state claim for the same reasons as the federal claim.

CONCLUSION

Katie Wagoner's accounts were not in default at the time NPAS obtained them for servicing. Because the debts were not in default at that time, NPAS was not a debt collector under either the Fair Debt Collection Practices Act or the Indiana Deceptive Consumer Sales Act when it sent billing statements to her. In particular, NPAS was exempted by federal law. 15 U.S.C. § 1692a(6)(F)(iii). Accordingly, the court GRANTS summary judgment for NPAS (ECF 35), DENIES Ms. Wagoner's crossmotion (ECF 40), and DIRECTS the clerk to enter judgment for NPAS.

SO ORDERED.

April 27, 2020                                  s/ Damon R. Leichty
                                               Judge, United States District Court